D. H. DARLING *vs.* FRED T. BRADSTREET.

Kennebec.    Opinion March 1, 1915.

*Breach.    Contract.    Damages.    Dividends.    Exceptions.    Sale.    Stock.*
*R. S., Chap. 70, Sec. 51.*

1.  Whether a contract was entered into by the plaintiff and defendant, the terms thereof, if made, whether the plaintiff performed the services called for by the contract or not, were questions of fact for the jury and were submitted to them, with proper instructions as to the force and effect of the testimony, the acts and conduct of the parties, the degree of credit to be given to witnesses, and the explanations of their acts and conduct.

2.  The jury having decided that the contract was made and performed, as claimed by the plaintiff, and there being sufficient evidence, if believed by them, to authorize that finding, the court will not substitute its judgment for theirs, and the finding by the jury is binding upon the parties.

3. The plaintiff was asked upon cross-examination this question, "After you came down here and got ready to establish your home, were you informed that Mr. Bradstreet had provided a house that you could occupy rent free?" The question was objected to, excluded and exceptions taken to its exclusion. The court overruled the exception, on the ground that the furnishing of a house, if furnished, .was no part of any contract entered into between the plaintiff and defendant and had no tendency to prove or disprove the contention of either plaintiff or defendant.

On motion and exceptions by defendant. Exceptions overruled; If plaintiff within thirty days after the certificate is filed remits all of the verdict in excess of $20,772.99, motion overruled; otherwise, motion sustained, new trial granted.

This is an action on the case to recover damages for breach of a contract, whereby the defendant agreed to sell to the plaintiff one-sixth of the capital stock of the Bradstreet Lumber Company for the sum of five thousand dollars, to be paid for from the profits of the business of the company when they could be divided. The contract also covered the employment of the plaintiff by the company. Plea, the general issue, with brief statement. The defendant, during the trial of the case, excepted to the exclusion of certain evidence. The jury rendered a verdict for the plaintiff of $25,129.24, and the defendant filed a general motion for a new trial.

The case is stated in the opinion.

*George W. Heselton,* for plaintiff.

*Butler & Butler,* for defendant.

SITTING: SAVAGE, C. J., KING, HALEY, HANSON, PHILBROOK, JJ.

HALEY, J. This is an action of assumpsit to recover damages for the breach of an alleged contract for the sale of one-sixth of the capital stock of the Bradstreet Lumber Company, was tried to a jury at the March term, 1914, in Kennebec County, the plaintiff recovered a verdict for $25,129.24, and the case is before this court upon motion and exceptions.

It is the claim of the plaintiff, the son-in-law of the defendant, that while working in New York, in March, 1905, he entered into negotiations with the defendant for the purchase of one-sixth interest in the capital stock of the Bradstreet Lumber Company, and, as a result, the contract relied upon in the case was made.

Nine letters passed between the parties in reference to the sale of the stock and employment of the plaintiff, and the contract claimed by the plaintiff is only stated in one of the letters, which is the letter of the defendant to the plaintiff, dated March 9, 1905, and which reads as follows:

"OFFICE OF F. T. BRADSTREET,

"Wholesale Dealer in Pine, Spruce and Cedar Logs.

Gardiner, Maine, March 9th, '05

My dear Harry:—

I have read your letters and Laura's.

I will sell you ½ of my 1-3 interest in the Bradstreet Lumber Co. for $5,000. This interest shall carry the treasureship at a salary of $1200 per year. The $5000 to be paid out of the profits when they can be divided. We are not dividing at present as no one is suffering for them and we want to get a working capital. At the present Mrs. J. S. and I are furnishing it, or at least the collateral on which we borrow it. So you and the girl for two or three years would have to live on your salary and her allowance. The $5000 when paid to be Baby Anne's and to be invested for her benefit. The profits last year show $20,000, and I look for as good a year this. We can't expect to do this every year but ought to do from 10 to $12,000. This will make you your own man and as interested in the welfare of the Co. as any of us. You can live in Richmond summers and anywhere your income will allow winters. Although it would be desirable for you to spend part of your time in the woods familiarizing yourself with the value of our lands as well as others that we might wish to buy, or the stumpage from them.

Tell Laura if she wants Port or anything else to go to Kirk's Corner of B'dway and 27th and buy it and buy Rachael some "black and white."

Y'rs truly,

DAD."

There was no acceptance in writing of the offer contained in the above letter, although there was more or less correspondence between the parties and the plaintiff's wife and the defendant after it's receipt by the plaintiff.  On March 13th the plaintiff wrote the defendant and inquired when he would want him to begin his employment, "and also who determines whether profits are to be divided, and when divided to what they are credited?  As I understand the matter the shares you offer me could not become mine unless and until the profits were divided.  Am I right?  . . . .  If you are sure you can use me and I am sure of it, when would you want me?" And the defendant's reply to that part of the inquiry was, "You should begin very soon as I want two of our towns looked over this spring with a view of logging them next winter.  The time of dividing the profits will probably be determined by vote of the Co.  I don't think, however, that they will be divided until we get about $60,000 for a working capital.  Last years profits are now in logs and lumber carried over and not in cash.  We have borrowed 40 M on the winter's operation.  We want about 60 M to carry on the business & be all easy.  There is no doubt you and Laura would have to live on your salary for two or three years."

June 1, 1905, the plaintiff came to Maine and entered upon his duties as treasurer of the Bradstreet Lumber Company, to which office he was elected on that date, and held the position until the corporation meeting April 18, 1910, when he was not re-elected. From August 18, 1910 to November 1, 1913, he continued as bookkeeper of the company and performed all the duties of treasurer, except that of signing the company's checks and notes.

EXCEPTIONS.

The plaintiff was asked, upon cross examination:  "Q.—After you came down here and got ready to establish your home, were you informed that Mr. Bradstreet had provided a house that you could occupy, rent free?"  The question was objected to, excluded and exception taken to its exclusion.  There is no pretense that the furnishing of the house, if furnished, was a part of any contract entered into between the plaintiff and the defendant.  That, if furnished, it was a mere gratuity upon the part of the defendant there can be no question; and it had no tendency to prove or disprove the contention of either the plaintiff or the defendant.  The only issue submitted to the jury was:  Was there a contract between the

parties as shown by the letter of March 9th and referred to in the letter of March 13th, and the furnishing of house rent free would have no tendency to prove or disprove the making of such a contract, and the exception must be overruled.

The bill of exceptions also contains an extract from the Judge's charge, to which exceptions were taken. It covers more than four pages of the printed record, and contains several propositions of law and fact, many of which were admitted at the trial or conceded by both sides to be the correct rule, and the only one that is urged is to an instruction allowing the jury upon that branch of the case to fix the value of the mill. The exception is not in proper form, does not comply with the statute, Sec. 51, R. S., Chap. 70, and, as held in *McKown* v. *Powers*, 86 Maine, 295, such a bill of exceptions is a direct violation of the practice of this court and has been condemned by a long line of decisions. But, as the only question urged in the bill of exceptions is discussed upon the motion for a new trial, the defendant has the same benefit that he would have had, if it had been in conformity with the statute.

MOTION.

The plaintiff claims that he accepted the offer made in the letter of March 9th, and that, relying upon that and the other letters of the defendant as to the terms of the employment, he moved to Maine and entered upon the performance of the duties required by the terms of the contract to entitle him to a one-sixth interest in the stock, and the profits earned by the stock, that during his employment the dividends earned by the stock more than paid the agreed price of the stock, and that the defendant has never delivered or accounted to him for the stock or its value; that the defendant understood that the offer had been accepted, and allowed the plaintiff to so understand, until the winter of 1905 or 1906, when the plaintiff, by reason of something that occurred, went to the home of the defendant in the evening, accompanied by his wife, with the letters introduced in the case, at which time the defendant denied that he had made any contract with the plaintiff, as follows: "Q.—What did he say to you about it? A—He denied there was any agreement, asked me to leave the letters which I had regarding it, and said, 'If you don't leave the letters you may never speak to me of this thing again, and if you try to force this matter, your position in the company will be very unpleasant.' "

The defendant met the plaintiff's wife after the above interview, and she testified: "Q—I only want to ask you one question. Do you recall of speaking with your father a day or two after you and your husband called at the house? A—I do. Q—What was the conversation? A—I asked my father to do right by that contract. Q—What did he say? A—He said, 'I have changed my mind.' "

The defendant, upon the other hand, contends that there never was any valid contract between the parties; that their minds did not meet; that it was not his understanding, or the plaintiff's understanding, that the contract as outlined in the letter was the contract under which the defendant was working. The defendant does not attempt to state his understanding of the terms of the plaintiff's employment, or why he did not think he was working according to the offer contained in the letter of March 9th; nor does he deny, except by stating that he does not remember, the significant language that his daughter testified to as above.

Whether a contract was entered into by the plaintiff and the defendant, the terms thereof, if made, whether the plaintiff performed the services called for by the contract or not, were questions of fact for the jury, and were submitted with proper instructions as to the force and effect of the testimony, the acts and conduct of the parties, the degree of credit to be given to witnesses, and the explanations of their acts and conduct, and the jury having decided that the contract was made and performed, as claimed by the plaintiff, and there being sufficient evidence, if believed by them, to authorize that finding, we should not substitute our judgment for theirs, and their finding must be binding upon the parties.

The defendant insists that there was error in the assessment of damages. The rule of damages was agreed to by counsel and stated by the court to the jury, that, if the plaintiff recovered, "the amount which he is entitled to recover, by the agreement or consent of both counsel, is $22,796.34. That includes one-sixth of the total profits of this concern up to the summer of 1914, and then the figures given me by the defendant's counsel, interest for the plaintiff on the first four dividends, $2432.50; the interest for the plaintiff on the fifth dividend, $256; the interest for the plaintiff on the sixth dividend, $89.42, and the interest for the plaintiff on the seventh dividend, $137.78. These are the figures given me by the defendant, as conceded." And the court also authorized the adding of $430.13,

interest upon the coupons received by the defendant. "This is in addition to what the defendant conceded to make the total, $23,226.47 to which the plaintiff would be entitled to recover, according to the auditor's report, and in regard to which, as I understand it, there is no dispute except as to the interest on the coupons of $430.13." The jury was also instructed that to the above amount should be added one-sixth of the value of the mill; all other assets of the company were included in the dividends that make up the $23,226.47.

It is conceded by counsel for both parties that, to arrive at the verdict which the jury did, they must have figured the value of the mill at $40,000 and added to the plaintiff's damage one-sixth of said sum, and, as properly instructed by the court, deducted from the total the $5000 purchase price of the stock. And the defendant earnestly urges that there was no testimony that authorized the jury to place that valuation upon the mill. The mill was built by the defendant in 1903, and sold by him to the Bradstreet Lumber Company. The only evidence of value was the testimony of W. F. Henderson, a large stockholder and the treasurer, as follows: "Q— Can you tell from the records of the company, how much the cost of the mill was? A—I could tell from the book of construction. I can't in the ledger. Q—Can't you tell something from the record that you made there? The Court: Isn't that the easiest way in the ledger? Mr. Heselton: He has got before him a vote of the company. A—This is a vote that was taken at different times to purchase F. T.'s interest down there. He owned the whole of it, but this wouldn't be the exact construction account. This says $39,000 here. It cost $45,000. The Court: You know. Q—If you know what it cost, state it? A—It cost $45,000."

The mill was shut down in December, 1913, the manufactured stock all sold, and no testimony of its market value, how much it had depreciated, and its market value at any time does not appear. The company earned large profits, but that was because the three owners of the stock had valuable tracts for stumpage, and furnished the lumber to operate the mill. Without those contracts the mill probably would not have earned the money that it did earn, and we do not think there was testimony which justified the jury in fixing the value of the mill at $40,000. It is a well known fact that mills, situated as this one was, will not bring in the market one-half their cost. It had been operated for ten years, had ceased to be

operated, and no lumber permits went with it, and when sold by the defendant, ten years before, was offered for $39,000, when he and the other stockholders could and did furnish it lumber from the lots cut under their permits.   We do not think it possible that, at the time of suit, it could have been sold for $25,000, and, if valued at that sum, surely the plaintiff will not be wronged.   The one-sixth difference between the valuation of $40,000 and $25,000 is $2500, which should be deducted from the amount found by the jury.   By the rule of damages agreed upon at the trial, the plaintiff was credited upon the purchase price of the stock the dividends earned by the stock and interest upon those dividends.   And the court further authorized the jury to add interest upon the coupons of the bonds holden by the company.   As the defendant was charged interest upon the dividends which were to pay and did pay the purchase price of the stock, it is but fair that the purchase price should bear interest during the time the defendant was charged for interest on the dividends, from September 30, 1907, to December 20, 1913, $1856.25, making a total of $4356.25, which should be deducted from the verdict as returned.   Accordingly the certificate will be,

> *Exceptions overruled; if the plaintiff, within thirty days after the certificate is filed, remits all of the verdict in excess of $20,772,99, motion overruled; otherwise, motion sustained, new trial granted.*